RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0054p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ST. MARYS CEMENT INC.,

*Petitioner,*

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY,

*Respondent.*

⎱ Nos. 13-3105/14-3479

───────────────

On Petition for Review from the
United States Environmental Protection Agency.
No. EPA-RO5-OAR-2010-0954.

Argued: March 4, 2015

Decided and Filed: March 24, 2015

Before: CLAY, GILMAN, and SUTTON, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Fredrick J. Dindoffer, BODMAN PLC, Detroit, Michigan, for Petitioner. Alan D. Greenberg, UNITED STATES DEPARTMENT OF JUSTICE, Denver, Colorado, for Respondent. **ON BRIEF:** Fredrick J. Dindoffer, Nathan D. Dupes, BODMAN PLC, Detroit, Michigan, for Petitioner. Laurel A. Bedig, UNITED STATES DEPARTMENT OF JUSTICE, Denver, Colorado, for Respondent.

───────────────

## OPINION

───────────────

SUTTON, Circuit Judge. The Clean Air Act enlists the States and the United States to improve visibility in the nation's federal parks and wilderness areas, among other goals. Part of this effort requires factories to add new pollution-limiting technology. One factory faced with

this requirement is St. Marys Cement. (More on why St. Marys makes portland cement but not apostrophes later.) The Michigan Department of Natural Resources and Environment deemed the plant's pollution controls sufficient and excused St. Marys from the retrofitting requirement. The United States Environmental Protection Agency disagreed and required the plant to add more stringent pollution controls. St. Marys petitions this court to vacate the decision, disclaiming the value of the required technology and claiming that the plant at any rate is exempt from the retrofitting requirement. We disagree on both fronts and deny St. Marys' petition.

I.

A.

As enacted in 1963, the Clean Air Act sought to reduce the emission of air pollutants that endangered "the public health and welfare." 42 U.S.C. § 7401(b)(1); *see Ala. Power Co. v. Costle*, 636 F.2d 323, 346–50 (D.C. Cir. 1979). In 1977, Congress amended the Act to cover pollution-caused visibility problems in national parks and wilderness areas. *See* Clean Air Act Amendments of 1977, Pub. L. No. 95-95, § 128, 91 Stat. 685, 742 (codified at 42 U.S.C. §§ 7491(a)(1), 7492(a)). The 1977 Amendments required the EPA to reduce visibility-impairing emissions by adopting nationwide rules that limit the release of relevant pollutants. *See* 42 U.S.C. § 7491(b). As with other Clean Air Act programs, the States enforce these rules by proposing implementation plans to the EPA for approval. *See* §§ 7410(a)(2)(J), 7491(b)(2). If a plan satisfies the "applicable requirements . . . relating to . . . visibility protection," the EPA will approve it. § 7410(a)(2)(J). If a State's plan falls short, the EPA must reject it and develop a federal implementation plan in its place. *See* § 7410(c)(1).

The EPA promulgated its first set of visibility regulations in 1980. *See* Visibility Protection for Federal Class I Areas, 45 Fed. Reg. 80,084 (Dec. 2, 1980) (codified at 40 C.F.R. §§ 51.300–.307). "[G]enerally," the Agency found, "two types of air pollution . . . reduce or impair visibility": emissions from pinpoint sources that "obscure the sky or horizon" in the local area, and "widespread" regional haze that "impairs visibility in every direction over a large area." *Id.* at 80,085. The 1980 regulations addressed pinpoint sources only, leaving the problem of regional haze for another day.

That day came in 1999, when the EPA promulgated the Regional Haze Rule. Regional Haze Regulations, 64 Fed. Reg. 35,714 (July 1, 1999) (codified at 40 C.F.R. §§ 51.308–.309). The Rule requires the States to determine which facilities within their borders create visibility-impairing pollutants that may "be emitted and transported downwind" to a federal park or wilderness area. *Id.* at 35,739–40. States then must decide which of those sources are eligible for "Best Available Retrofit Technology," 40 C.F.R. § 51.308(e), a mouthful that gives some acronyms (here BART) a good name.

What is BART? The idea is to put up-to-date pollution controls on older sources of pollution that could not have included the emission controls when the company built the plant. § 51.308(e)(1)(ii)(A). All "stationary sources of air pollutants" that came "in[to] existence" during a fifteen-year period between 1962 and 1977, the Regional Haze Rule says, are "BART-eligible." 40 C.F.R. § 51.301; *see* 42 U.S.C. § 7491(b)(2)(A). A source was "in existence" during that period, the Rule elaborates, if the source's owner had "obtained all necessary preconstruction approvals" to build the source and had begun "physical on-site construction" of the source or had "entered into binding agreements" to do so before August 1977. 40 C.F.R. § 51.301. Once the States conclude which sources are BART-eligible, they must determine the best available technology for each source. *See* 40 C.F.R. § 51.308(e). That determination goes into a State implementation plan that the EPA must approve. *Id.* The EPA uses the notice-and-comment rulemaking process in deciding whether to accept the plan. 42 U.S.C. § 7607(d)(3)–(6). Any new required technology must be installed at the owner's expense. *See* 40 C.F.R. § 51.308(e)(1)(iv).

B.

St. Marys Cement Group is based in Ontario, Canada. It is named after the town of its founding, St. Marys, which is blessed with an abundance of limestone and which sits not far from the St. Marys River that separates Canada from Michigan. The company owns several plants that manufacture portland cement, a limestone-based powder that, when mixed with water and rocks, forms concrete.

(The apostrophes missing from the names of the company, town, and river warrant a brief digression. In 1898, the Geographic Board of Canada discouraged the possessive form of place

names wherever possible, presumably to avoid suggesting private ownership of a public place. If a city kept the possessive, the Board directed it to drop the apostrophe. The Canadian government amended the rule in the 1970s to allow the retention of the apostrophe where it was well established. Some communities today thus use the possessive with their towns and cities, and others do not. St. Marys—the city—had long kept the apostrophe and possessive connotation because the town had dedicated the city to St. Mary. But for reasons of its own it dropped the apostrophe in 1968 and even managed to persuade the cement company to drop the apostrophe from its name as well. *See* Alan Rayburn, *Naming Canada: Stories About Canada Place Names* 70–71 (2001). Nor is this a Canadian invention; it may indeed be an American export. In 1890, President Benjamin Harrison established the Board on Geographic Names, which adopted a similar policy and according to one estimate has removed 250,000 apostrophes from federal maps. Barry Newman, *Theres a Question Mark Hanging Over the Apostrophes Future*, Wall St. J., May 15, 2013, at 1. All of this explains why there is a St. Marys, West Virginia, and a song to go with it. Jim Ruckman, *There Ain't No Apostrophe in St Marys, lyrics available at* http://goo.gl/uSkRmy; *see also Fowler's Dictionary of Modern English Usage* 58–59 (Jeremy Butterfield ed., 4th ed. 2015) (noting that "standard editions of local maps are the best guide to the correct spelling of the hundreds of names of this type"). *See generally* George R. Stewart, *Names on the Land* (1945); *see more generally* Wallace Stegner, *Where the Bluebird Sings to the Lemonade Springs* 166–71 (Modern Library reprt. ed. 2002) (1992) (reviewing *Names on the Land*).)

St. Marys—the company—purchased the cement plant at issue in this case—the one located in Charlevoix, Michigan—in 2005. It was not the first owner of the plant. Medusa Cement had opened the plant in 1967 and had modified it several times over the years. By 2005, when St. Marys acquired the plant, the EPA had already promulgated the Regional Haze Rule. Michigan submitted its initial plan to implement the Rule in 2007, but the EPA rejected the plan in early 2009—in part because it did not include BART limitations for the Charlevoix plant. Failure to Submit State Implementation Plans, 74 Fed. Reg. 2392, 2393 (Jan. 15, 2009). Michigan responded with an updated plan in 2010, yet the EPA issued a notice in August 2012 that proposed rejecting it too. Michigan Regional Haze State Implementation Program, 77 Fed. Reg. 46,912 (proposed Aug. 6, 2012) (finalized at 77 Fed. Reg. 71,533 (Dec. 3, 2012)).

Michigan's plan for St. Marys still came up short, the Agency explained, because the State did not require St. Marys to install any new technology to meet BART requirements. The EPA believed that the plant could reduce nitrous oxide emissions—a key visibility-impairing pollutant—through updated controls. The EPA noted in its proposal that it would accept public comments through September 5, 2012.

St. Marys submitted two sets of comments. The first challenged the EPA's proposed standards on technical and scientific grounds. These comments were filed on time. The second set of comments was not. At some point after the comment period ended and after it learned that the EPA planned to reject its first set of comments, St. Marys discovered the Charlevoix plant's permitting history. When it saw that a 1978 permit included new-source standards, it surmised that the EPA must have treated the former upgrades as reconstructions. If so, that meant it was off the hook because "any emissions unit for which a reconstruction 'commenced' after August 7, 1977, is not BART-eligible." 40 C.F.R. pt. 51, app. Y, § II.A.2. Because construction for the upgrades did not begin until 1978, St. Marys thought that the Charlevoix plant might be exempt.

St. Marys met with the EPA in October 2012 about the issue and submitted comments to that end in mid-November. At the company's request, Michigan also sent a letter to the EPA saying "that the [Charlevoix] facility should not be considered BART-eligible." App. at 158.

The efforts came too late. At the beginning of December, the EPA promulgated a final rule that rejected Michigan's regional haze plan and promulgated more stringent standards for the Charlevoix plant. 77 Fed. Reg. at 71,547. The Agency acknowledged St. Marys' late comments and, although it promulgated the rule anyway, agreed to "carefully review" the new comments "and take any action warranted." *Id.* at 71,537 n.1. St. Marys asked the EPA to reconsider its rulemaking, *see* 42 U.S.C. § 7607(d)(7)(B), and the agency rejected that motion as well on procedural and substantive grounds.

II.

We start by addressing St. Marys' challenge to the EPA's rejection of its first set of comments—the ones filed on time. To reduce the Charlevoix plant's nitrous oxide emissions, the EPA required St. Marys to install Selective Non-Catalytic Reduction technology. The

technology injects ammonia or urea into a plant's smokestacks, which causes a chemical reaction that reduces nitrous oxide levels. The EPA estimated that the technology would reduce nitrous oxide emissions by fifty percent. St. Marys disputes that estimate. It claims that the EPA all too simply assumed that the technology would work at the Charlevoix facility because that technology had worked at other cement plants. Had the EPA properly used a "case-by-case" analysis for assessing BART, as it was supposed to, 40 C.F.R. § 51.301, St. Marys believes the EPA would have realized that the plant's unique characteristics make the new technology ineffective. The EPA's failure in that regard, St. Marys concludes, makes its final rule invalid. We disagree.

Judges are not executive-branch administrators. We do not have authority to implement federal programs. And we do not have authority to set aside rulemaking efforts whenever we disagree with them. Only when a rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" may we invalidate it. 42 U.S.C. § 7607(d)(9)(A). This "narrow" standard of review, identical to the one under the Administrative Procedure Act, forbids us from "substitut[ing] [our] judgment for that of the agency" and requires the agency only to have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009); *see Catawba Cnty. v. EPA*, 571 F.3d 20, 41 (D.C. Cir. 2009).

No such flaw appears in the EPA's decision. The agency engaged in case-by-case review, just as the notice-and-comment process anticipated, and proposed that St. Marys install the new technology at the Charlevoix plant for two main reasons. One: St. Marys had successfully used that same technology at one of its other plants. Two: Many EPA-commissioned studies show that this technology effectively reduces nitrous oxide emissions at portland-cement plants. *See* 77 Fed. Reg. at 46,923–24. As for the proposed fifty-percent nitrous oxide reduction rate, the Agency landed on that number because the Charlevoix plant's emissions were typical for portland-cement plants and that level of reduction was typical at similar plants. *See id.* at 46,924, 71,538.

Comments received during the public comment period did not undermine these premises. St. Marys told the EPA that the proposed technology would not work at the Charlevoix plant due

to the plant's unique characteristics. But when the EPA promulgated its final rule, it addressed each of St. Marys' site-specific objections fairly and in detail. *See id.* at 71,537–47.

When all is said and done, St. Marys' key complaint, it seems to us, targets the EPA's technical and scientific views. St. Marys says its own testing shows that the fifty-percent reduction rate is wishful thinking; the EPA says that St. Marys could have met the fifty-percent mark had it tested ammonia rather than urea. St. Marys says that the technology would release too much ammonia into the atmosphere and thus cause a nuisance; the EPA says that other portland-cement plants have remedied that problem. St. Marys says that the technology would plug up the cement-manufacturing process and lead to temporary shutdowns of the plant; the EPA points to "numerous variables that [St. Marys] can adjust and design features it can modify" to avoid those problems. *Id.* at 71,541. Maybe time will prove St. Marys right on some of these fronts; maybe not. But arbitrary and capricious review does not ask who is right. It asks whether the EPA followed a defensible process in assessing who is right. As to that, it cannot be said that the EPA "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). On top of that, we are at our "most deferential" when "reviewing an agency's scientific determinations" about issues within its expertise, *Ky. Res. Council, Inc. v. EPA*, 467 F.3d 986, 991 (6th Cir. 2006), which assuredly includes an inquiry into how to reduce nitrous oxide emissions by fifty percent at a cement plant. We uphold the EPA's judgment that this new technology will work effectively at the Charlevoix plant.

III.

St. Marys does not stop there. It also argues that the Charlevoix plant was never BART-eligible in the first place and thus cannot be subject to the new technology or for that matter any other retrofit emissions controls. St. Marys forfeited that argument, however, by failing to raise it during the public comment period.

When a company or individual challenges EPA-promulgated implantation plans, it must comply with the Clean Air Act's judicial-review provisions. *See* 42 U.S.C. § 7607(d)(1)(B).

One such provision says that "[o]nly an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment . . . may be raised during judicial review." § 7607(d)(7)(B). A party wishing to raise a new objection after the comment period ends may ask the EPA to reconsider its implementation plan, but the EPA may refuse unless the "objection is of central relevance to the outcome of the rule" and either the objection was "impracticable to raise" within the comment period or the "grounds for . . . objection arose after the period for public comment." *Id.*; *see Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1158 (D.C. Cir. 2013). If the EPA refuses reconsideration, a party "may seek review of such refusal" in the courts of appeals. 42 U.S.C. § 7607(d)(7)(B).

St. Marys concedes that it did not raise its concerns about the plant's BART-eligibility until after the public comment period closed and after it learned that the EPA was not persuaded by its first set of comments. In its words: "It was not until an October 10, 2012 meeting with the EPA, after the public comment period had closed, that St. Marys realized [the] EPA was intent on imposing much more stringent [emissions] limits. As a result, St. Marys reevaluated its entire strategy and investigated whether the Charlevoix plant was BART-eligible in the first place." Pet'r Br. at 51–52. Until then, the record contained no argument with "reasonable specificity" that the Charlevoix plant was ineligible for BART. *See* App. at 427, 456, 476; *Nat'l Res. Def. Council v. EPA*, 559 F.3d 561, 563 (D.C. Cir. 2009). That means St. Marys forfeited a direct challenge to the EPA's rulemaking on the ground that the plant was not BART-eligible in the first place.

This one conclusion does not necessarily lead to another—that St. Marys has no recourse. Section 7607 still allows us to review whether the EPA properly refused to *reconsider* its rule. The problem here is that we do not see how it was "impracticable" for St. Marys to raise its BART objection during the comment period, as the statute requires. 42 U.S.C. § 7607(d)(7)(B). St. Marys had ample opportunities to research the relevant permitting history before and during the public comment period. After all, it owned the plant and could have located the information by searching the plant's own files or by requesting the Michigan agency to provide them to it (as eventually happened). Nothing about that history "arose" after the comment period, which otherwise would excuse its belated argument. § 7607(d)(7)(B). It arose decades before it, when

Michigan first approved the permit.  On this record, the Agency did not act arbitrarily or for that matter capriciously when it refused to reconsider its decision.  *See* § 7607(d)(9)(D)(i).

St. Marys offers several responses, all unconvincing.  It first claims that the company may not forfeit arguments with respect to BART eligibility because that issue speaks to the EPA's "statutory authority" and thus the Agency's "jurisdiction."  Reply Br. at 21.  Section 7607, however, is a claim-processing rule that does not speak to the agency's or anyone else's jurisdiction.  *See EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1602–03 (2014).  "By the very terms of the statute[,] [the] timeliness requirement applies to all objections."  *Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1173 (D.C. Cir. 1980).  That all questions concerning an agency's interpretation of a statute, if pressed by creative lawyers, may "be reframed as questions about the scope of agencies' regulatory jurisdiction," *City of Arlington v. FCC*, 133 S. Ct. 1863, 1870 (2013), does not permit St. Marys to sidestep this requirement.  The only question is whether St. Marys may forfeit a challenge to an agency's reading of a statute that it administers.  It may.  *See Natural Res. Def. Council v. EPA*, 571 F.3d 1245, 1259 (D.C. Cir. 2009); *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 860 (D.C. Cir. 2001).  Congress is free to require affected parties to submit comments about proposed agency rules during a public comment period and to impose consequences for failing to do so.

St. Marys adds that the EPA had an "[i]ndependent [d]uty" to consider the Charlevoix plant's BART-eligibility, no matter whether St. Marys argued the point or not.  Pet'r Br. at 46.  The premise of the argument is that the EPA has "a duty to examine [its] key assumptions as part of its affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule."  *Natural Res. Def. Council v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014).  That means it "must justify [such] assumption[s during judicial review] even if no one objects to [them] during the comment period."  *Id.*

The key-assumption exception to the forfeiture rule does not apply here.  A first requirement of the exception is that the EPA made an assumption:  that it took something for granted or supposed something to be true.  *See Webster's Third New International Dictionary* 133 (rev. ed. 2002).  That explains why the EPA would apply the exception to an assumption that state law could not apply to certain Indian-owned lands.  *See Okla. Dep't of Envtl. Quality v.*

*EPA*, 740 F.3d 185, 192 (D.C. Cir. 2014).  Or why it would apply the exception when "there [was] *not one word* in the proposed or final rule that explain[ed] why the Agency chose to distinguish" between two sets of regulated entities.  *See Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 949 (D.C. Cir. 2004).  Or why it would apply the exception when the EPA adopted a predictive model without addressing the soundness of that methodology.  *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 534–35 (D.C. Cir. 1983).

Yet the EPA did not *assume* anything material in this instance.  The forfeited point relates to what happened to a specific plant at a specific time in the past.  As to that, the EPA relied on record evidence from the Michigan agency that the plant was BART-eligible.  Evidence about a point is not an assumption about the point or a supposition about it.  It is a standard, everyday factfinding by a decisionmaker based on the record evidence presented by the parties.  As an interested party, St. Marys had the right to build that record or to build a different record by submitting other evidence of the plant's permitting history.

At most, one might say that the EPA to some extent relied on the State of Michigan's decision that St. Marys was BART-eligible.  Yet that makes sense.  St. Marys did not challenge this premise of the State's decision, and the Clean Air Act entrusts the States with figuring out which sources must install BART.  *See* 42 U.S.C. § 7491(b)(2), (b)(2)(A).  It would seem odd to penalize the EPA for doing the same.

Compare this rulemaking with the setting in which the key-assumption doctrine most often applies—the D.C. Circuit's authority to review (often exclusively) nationwide rules promulgated by federal agencies.  To use one example in the clear-air arena:  "A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard . . . or any other nationally applicable regulations . . . may be filed only in the United States Court of Appeals for the District of Columbia."  42 U.S.C. § 7607(b)(1).  The validity of a nationwide rule—and the assurance that it is non-arbitrary— should not turn on the caprice of who happens to challenge it or not challenge it and what arguments are made or not made during the rulemaking process.

Those concerns do not apply to a single plant in a single State under a single EPA program, where it is entirely fair to determine the history of a plant based on the record before it,

not the record established by the company *after* the EPA expresses skepticism about the company's first theory of non-regulation.  In the latter setting, our setting, there is no reason to ignore—in truth override—the forfeiture directive established by Congress.

St. Marys persists that the EPA excused the forfeiture by placing the late comments on the rulemaking docket and thus into the record for judicial review.  Yet the record for judicial review, the Clean Air Act says, consists in part of material that the EPA *must* place on the docket.  *See* § 7607(d)(4)(B)(i), (d)(7)(A).  That does not mean all docketed materials make it into the administrative record.  The EPA presumably can docket whatever it wants until the rule is published, § 7607(d)(6)(C), but only "written comments . . . received . . . *during the comment period*" must be docketed and thus become part of the record for our review.  § 7607(d)(4)(B)(i) (emphasis added); *see* § 7607(d)(7)(A).

The EPA's proposed rule for the Charlevoix plant set forth a limited period for affected parties to submit public comments.  St. Marys' objection to the plant's BART-eligibility determination did not come until after that period ended—indeed until after the EPA had rejected the company's *other* objection to the rulemaking.  That was too late to preserve the objection.  It is forfeited.

For these reasons, we deny St. Marys' petition to vacate the EPA's final rule.