RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0331p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

SIERRA CLUB,

                               *Petitioner*,

    *v.*

UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY; LEE ZELDIN, Administrator, United States
Environmental Protection Agency,

                               *Respondents.*

Nos. 23-3581/3583

─────────────

On Petition for Review from the Environmental Protection Agency.
No. EPA-R05-OAR-2023-0058.

Argued: December 12, 2024

Decided and Filed: December 5, 2025

Before: COLE, WHITE, and DAVIS, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Nicholas Leonard, GREAT LAKES ENVIRONMENTAL LAW CENTER, Detroit, Michigan, Elena Saxonhouse, SIERRA CLUB, Oakland, California, for Petitioner. Heather E. Gange, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. **ON BRIEF:** Nicholas Leonard, GREAT LAKES ENVIRONMENTAL LAW CENTER, Detroit, Michigan, Elena Saxonhouse, Sanjay Narayan, SIERRA CLUB, Oakland, California, for Petitioner. Heather E. Gange, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. John Minode'e Petoskey, EARTHJUSTICE, Chicago, Illinois, Nicholas J. Schroeck, DETROIT MERCY LAW ENVIRONMENTAL LAW CLINIC, Detroit, Michigan, David M. Flannery, Keeleigh S. Huffman, STEPTOE & JOHNSON PLLC, Charleston, West Virginia, Dallas F. Kratzer III, STEPTOE & JOHNSON PLLC, Columbus, Ohio, Gaëtan Gerville-Réache, Joshua J. Reuter, WARNER NORCROSS + JUDD LLP, Grand Rapids, Michigan, Elbert Lin, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Amici Curiae.

---

**OPINION**

---

HELENE N. WHITE, Circuit Judge.  Petitioner Sierra Club challenges two decisions of Respondent Environmental Protection Agency (EPA) regarding the Detroit area's attainment of ambient air quality standards under the Clean Air Act (CAA): (1) the approval of Michigan's exceptional-events request, and (2) the redesignation of the Detroit area to attainment, based in part on the EPA's interpretation of the CAA, which allows an area to be redesignated to attainment without meeting reasonably available control technology (RACT) requirements that came due after the state filed an application for redesignation.  We affirm the approval of Michigan's exceptional-events request and vacate the redesignation of the Detroit area to attainment.

**I.**

**A.**

The CAA requires the EPA to identify air pollutants that "may reasonably be anticipated to endanger public health or welfare" and whose "presence . . . in the ambient air results from numerous or diverse mobile or stationary sources."  42 U.S.C. § 7408(a)(1)(A), (B).  It must then issue "air quality criteria" that reflect "all identifiable effects on public health or welfare" that may result from a given pollutant's presence in the ambient air.  *Id.* § 7408(a)(2).  Next, it must propose and promulgate National Ambient Air Quality Standards (NAAQS), "the attainment and maintenance of which . . . allow[] an adequate margin of safety."  *Id.* § 7409(b)(1).

Once the EPA establishes new or revised NAAQS, it designates areas of the country as "attainment" (meaning the area meets the NAAQS), "nonattainment" (meaning the area does not meet the NAAQS), or "unclassifiable[.]"  *Id.* § 7407(d)(1)(A).  The EPA determines whether an area has reached attainment by calculating its "design value," which is the annual fourth-highest daily maximum eight-hour ozone concentration averaged over three years.  40 C.F.R. § 50 app. U (2015).  States with nonattainment areas must develop a State Implementation Plan (SIP) detailing how they will reach attainment.  42 U.S.C. § 7410(a).  States must adopt SIPs through

state-level notice-and-comment rulemaking and then submit them to the EPA for approval. *Id.* The statute also provides a mechanism for states to revise SIPs to account for changes in the environment or based on a nonattainment designation. *See, e.g.*, *id.* § 7410(2)(h)-(i). Once the EPA approves an SIP, it becomes binding on the state and is enforceable as federal law under the CAA. *Id.* §§ 7413, 7604(a).

42 U.S.C. § 7511a creates five classifications of nonattainment areas (Marginal, Moderate, Serious, Severe, and Extreme) and sets requirements for each classification. States with Marginal nonattainment areas must submit a revision to their operative SIP concerning the implementation of RACT. *Id.* § 7511a(a)(2)(A). The Administrator of the EPA issues guidance specifying the RACT requirements that states with Marginal nonattainment areas must implement. The EPA defines RACT as "the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility." *State of Mich. v. Thomas*, 805 F.2d 176, 180 (6th Cir. 1986). States with Moderate nonattainment areas must make additional revisions to their SIPs, requiring the implementation of RACT with respect to sources that emit a type of pollutant called volatile organic compounds (VOCs). 42 U.S.C. § 7511a(b)(2). The Administrator of the EPA issues a document listing the VOC sources for which states with Moderate nonattainment areas must implement RACT requirements. *Id.*

Section 7511 establishes attainment deadlines for areas based on their classification as Marginal, Moderate, Serious, Severe, or Extreme nonattainment. When the deadline for attainment expires, the EPA must determine whether the area met the NAAQS by the deadline. *Id.* § 7511(b)(2). Excluding Severe and Extreme areas, if an area fails to meet the NAAQS by the deadline, the area is reclassified to the higher of either the next highest classification or the classification applicable to the area based on its actual air quality. *Id.* § 7511(b)(2)(A). The area is then subject to the SIP requirements for its new classification, and a new deadline is set for meeting the NAAQS based on the new classification. *Id.* § 7511a(i).

The EPA can make a determination that an area designated as nonattainment has met specific ozone NAAQS (also known as a "Clean Data Determination"). 40 C.F.R. § 51.1318. When the EPA makes this determination, some planning requirements relating to the ozone

NAAQS are suspended until either the area is redesignated to attainment for the ozone NAAQS, at which point the requirements no longer apply, or the EPA determines that the area has failed to meet the ozone NAAQS, at which point the requirements go back into effect. *Id.*

When a nonattainment area is meeting the NAAQS, the Governor of the state where the area is located can submit a request to the EPA for redesignation to attainment. 42 U.S.C. § 7407(d)(3)(D). The EPA Administrator cannot redesignate an area unless:

> (i) the Administrator determines that the area has attained the national ambient air quality standard;
>
> (ii) the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of this title;
>
> (iii) the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;
>
> (iv) the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 7505a of this title; and
>
> (v) the State containing such area has met all requirements applicable to the area under section 7410 of this title and part D.

*Id.* § 7407(d)(3)(E). Redesignations of areas constitute agency rulemaking. *See* 5 U.S.C. § 551(4)-(5). They are therefore governed by the Administrative Procedure Act (APA), which requires agencies to provide "notice of proposed rule making" and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)-(c).

When assessing a request for redesignation, the EPA can exclude air-quality data that was influenced by an "exceptional event," defined as an event that:

> (i) affects air quality;
>
> (ii) is not reasonably controllable or preventable;
>
> (iii) is an event caused by human activity that is unlikely to recur at a particular location or a natural event; and
>
> (iv) is determined by the Administrator through the process established in the regulations promulgated under paragraph (2) to be an exceptional event.

42 U.S.C. § 7619(b); 40 C.F.R. § 50.14(a)(1)(i).  To request that such data be excluded, a state must notify the EPA that an exceptional event occurred, flag data that was affected by the event, and submit a demonstration that includes:

> (A) A narrative conceptual model that describes the event(s) causing the exceedance or violation and a discussion of how emissions from the event(s) led to the exceedance or violation at the affected monitor(s);

> (B) A demonstration that the event affected air quality in such a way that there exists a clear causal relationship between the specific event and the monitored exceedance or violation;

> (C) Analyses comparing the claimed event-influenced concentration(s) to concentrations at the same monitoring site at other times . . . ;

> (D) A demonstration that the event was both not reasonably controllable and not reasonably preventable; and

> (E) A demonstration that the event was a human activity that is unlikely to recur at a particular location or was a natural event.

40 C.F.R. § 50.14 (c)(2)(i), (c)(3)(iv).  The EPA must exclude air-quality data if the state "demonstrates to the Administrator's satisfaction that an exceptional event caused a specific air pollution concentration at a particular air quality monitoring location and otherwise satisfies the requirements of [§ 50.14]." *Id.* § 50.14(b)(1).  The determination whether to exclude the data is reached through public notice-and-comment rulemaking on the request for redesignation. *Id.* § 50.14(c)(3)(i).

**B.**

In June 2018, the EPA designated the Detroit area as Marginal nonattainment for the NAAQS the EPA had set in 2015.  Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 Fed. Reg. 25776, 25813 (June 4, 2018) (codified at 40 C.F.R. § 81.323 (2025)).  The Detroit area's deadline to reach attainment was August 3, 2021. Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Marginal for the 2015 Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 21842, 21849 (Apr. 13, 2022).  On April 13, 2022, the EPA proposed to make a determination that the Detroit area had failed to attain the 2015 NAAQS by the August 3, 2021 deadline. *Id*. at 21845, 21844.  The proposed rule set a deadline of January 1,

2023 for Michigan to submit SIP revisions for RACT and implement RACT for the Detroit area. *Id.* at 21856. On February 1, 2023, the EPA finalized its April 2022 determination that the Detroit area had failed to attain the 2015 NAAQS by the August 3, 2021 deadline. Finding of Failure to Attain and Reclassification of the Detroit Area as Moderate for the 2015 Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 6633, 6635 (Feb. 1, 2023). As a result, by operation of law, the Detroit area was redesignated from Marginal nonattainment to Moderate nonattainment. *Id.* As explained, areas designated as Moderate nonattainment are subject to additional RACT requirements. 42 U.S.C. § 7511a(b)(2). Although the proposed rule had set a RACT deadline of January 1, 2023, the final rule moved the deadline to March 1, 2023 because the original due date had already passed, and March was the beginning of the ozone season for the Detroit area. 88 Fed. Reg. at 6634–5.

In the meantime, in January 2022, Michigan submitted an application to redesignate the Detroit area from Marginal nonattainment to attainment of the 2015 NAAQS based on 2019–2021 data. Air Plan Approval; Michigan; Redesignation of the Detroit, MI Area to Attainment of the 2015 Ozone Standards, 87 Fed. Reg. 14210, 14210 (Mar. 14, 2022). The EPA proposed to redesignate the Detroit area from nonattainment to attainment in March 2022. *Id.* at 14210–11. The notice-and-comment deadline was April 13, 2022. *Id.* at 14210.

While Michigan's application for redesignation was pending, the ozone data for the Detroit area exceeded the 2015 NAAQS on June 24 and 25, 2022. *See* Air Plan Approval; Michigan; Clean Data Determination for the Detroit Area for the 2015 Ozone Standard, 88 Fed. Reg. 32584, 32587 (May 19, 2023). Michigan attributed the exceedances to smoke and other ozone precursors from wildfires in Canada that reached the United States. *Id.* at 32586. In January 2023, Michigan submitted a demonstration to the EPA seeking to exclude the data from June 24 and 25 when determining whether the Detroit area had reached attainment. *Id.* at 32584. The EPA concurred with the demonstration on January 30, 2023, *id.* at 32584, but under the APA, it was required to provide an opportunity for public comment on the claimed exceptional events and supporting data before taking final action. Air Plan Approval; Michigan; Clean Data Determination for the Detroit Area for the 2015 Ozone Standard, 88 Fed. Reg. 7382, 7383 (Feb. 3, 2023).

On February 3, 2023, the EPA published a proposed clean data determination stating that the Detroit area had attained the 2015 NAAQS for the 2020–2022 period. *Id.* at 7382. This constituted a proposed rule separate from the EPA's proposal to designate the Detroit area to attainment. The clean data determination proposal was based on calculations that excluded the June 24 and 25 data, as Michigan had requested. *Id.* at 7383. The proposed rule suspended SIPs and other planning requirements. *Id.* Comments on the proposal were due by March 6, 2023. *Id.* at 7382. On May 19, 2023, the EPA finalized the redesignation of the Detroit area to attainment. Air Plan Approval; Michigan; Redesignation of the Detroit, MI Area to Attainment of the 2015 Ozone Standards, 88 Fed. Reg. 32594 (May 19, 2023). That same day, the EPA finalized its clean data determination for the Detroit area. Air Plan Approval; Michigan; Clean Data Determination for the Detroit Area for the 2015 Ozone Standard, 88 Fed. Reg. at 32584. Michigan never submitted SIP revisions addressing the additional RACT requirements for Moderate nonattainment areas. But the EPA determined that Michigan did not have to make and implement those revisions in order for the Detroit area to be redesignated to attainment, reasoning that the prerequisite in 42 U.S.C. § 7407(d)(3)(E)(v) for a state to have "met all requirements applicable to the area under section 7410 of this title and Part D of this subchapter" did not include requirements that "came due after the submittal of a complete redesignation request." Redesignation of the Detroit, MI Area to Attainment of the 2015 Ozone Standards, 88 Fed. Reg. at 32611.

## II.

When evaluating a challenge to a federal agency's action, courts must overturn the action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C). To establish that a decision was not arbitrary or capricious, an agency must provide a satisfactory explanation for the decision, including a rational connection between the relevant facts and the decision made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When assessing whether an agency's action was arbitrary or capricious, "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court may not vacate an agency's decision unless the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is [highly] implausible[.]" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Courts are to be "most deferential when reviewing an agency's scientific determinations about issues within its expertise." *St. Mary's Cement, Inc. v. EPA*, 782 F.3d. 280, 286 (6th Cir. 2015) (citation and internal quotation marks omitted).

## A.

Sierra Club first contends that the EPA's exceptional-event approval following the June 2022 wildfires was arbitrary and capricious because (1) it ignored evidence that wildfire smoke did not meaningfully affect ozone concentrations at a Detroit area air monitor; (2) local data does not support the conclusion that wildfire smoke was present at the air monitor throughout June 24 and 25, 2022; (3) it failed to evaluate whether Michigan properly omitted several days from a data analysis in its exceptional-event demonstration; and (4) it did not analyze how local conditions contributed to high ozone levels on the exceptional-event days. These arguments all pertain to the exceptional-event requirement that Michigan establish to the EPA's satisfaction a "clear causal relationship" between the Canadian wildfire emissions and the exceedances on the relevant days. *See* 40 C.F.R. § 50.14(c)(3)(iv)(B) (2025).

Our review of the administrative record reveals that the EPA conducted a thorough evaluation of Michigan's exceptional-event demonstration and provided reasons for its decision. The EPA concluded that the exceedances at the Detroit-area monitor on June 24 and 25 were due to wildfire smoke based on the measurements of Brown Carbon (BrC) at the monitor, which is "a by-product of incomplete combustion and thus an indicator of wildfire smoke." Clean Data Determination for the Detroit Area for the 2015 Ozone Standard, 88 Fed. Reg. at 32586. The EPA further explained that "the meteorological conditions on the exceedance days examined in conjunction with local and background emissions do not present the conditions conducive to producing elevated ozone concentrations," so it concluded that "the exceedances at issue were due to wildfire smoke, rather than local pollution." *Id.* Thus, the EPA provided a sufficient

explanation for its decision to grant the exceptional-event approval, connecting the facts it found to the decision it made.

Sierra Club argues that the EPA failed to consider relevant information. Sierra Club first claims that the EPA ignored evidence that the wildfire smoke did not meaningfully affect ozone concentrations at the relevant area air monitor. It notes that Michigan used a screening analysis developed by the Lake Michigan Air Directors Consortium (LADCO) to find evidence from local monitoring data that wildfire smoke affected the monitor. According to Sierra Club, the undisputed fact that the standard deviations for the concentration of ozone, fine particulate matter (PM$_{2.5}$), and carbon monoxide were below 1 on the exceptional-event days suggests that wildfire smoke did not affect this monitor.

However, in response to Sierra Club and the Great Lakes Environmental Law Center's comment that the LADCO screening analysis "does not support a finding that wildfire smoke was present in the Detroit area during on June 24 or 25, 2022," the EPA explained that it had "evaluated and considered all the information provided in [Michigan]'s demonstration" and that it "reviews exceptional events demonstrations on a case-by-case basis using a weight of evidence approach considering the specifics of the individual event." Clean Data Determination for the Detroit Area for the 2015 Ozone Standard, 88 Fed. Reg. at 32589. It acknowledged that "[t]he LADCO analysis does not show a high peak (representing high 24-hr PM$_{2.5}$ concentrations) for PM$_{2.5}$ during this time period." *Id.* However, despite this data, it decided under the weight-of-evidence approach to grant the exceptional-event approval because other types of data, such as an analysis of hourly BrC data from Michigan's air monitoring network on June 24 and 25, "provide[d] evidence that wildfire smoke was present in the Detroit area, as well as at the ground level where measurements are made." *Id.* Sierra Club contends that the fact that the LADCO analysis contradicts the EPA's conclusion should have prevented the EPA from granting the approval. But the EPA's explanation demonstrates that it did not ignore the contrary evidence, as Sierra Club asserts, and also provides a satisfactory rationale for granting the approval despite the LADCO evidence.

Sierra Club next argues that the BrC and coarse particular matter ($PM_{10}$) data on which the EPA relied in granting the approval did not support a finding that wildfire smoke was present at the relevant air monitor throughout June 24 and 25. It asserts that the EPA has cautioned against relying on $PM_{10}$ concentrations as an indicator of smoke because "$PM_{10}$ generally tends to 'fall' to ground level relatively quickly in the vicinity of the event and, in our experience, is not usually subject to long range transport." EPA-R05-OAR-2023-0058-0031, Ex. 16, at 20. Sierra Club further notes that BrC pollution peaked on June 23, which was a day before the alleged exceptional event. It contends that because there was no spike in BrC concentrations on June 24 and merely a small spike in on June 25, the BrC data did not allow the EPA to conclude that the Canadian wildfires affected ozone levels in the Detroit area.

The EPA explained that Michigan "evaluated . . . $PM_{10}$ concentrations but did not rely solely on $PM_{10}$ concentrations for their multi-pollutant corroboration." Clean Data Determination for the Detroit Area for the 2015 Ozone Standard, 88 Fed. Reg. at 32589. It further stated that it "recognizes that long-range transport of wildfire smoke would not typically have an impact on nearby $PM_{10}$." *Id.* Therefore, it is clear that the EPA was aware of the limitations of $PM_{10}$ data.

Turning to the BrC data, the EPA explained why it concluded that wildfire smoke had affected the relevant monitor on June 24 and 25 even though BrC levels peaked on June 23:

> By June 23, 2022, smoke from these fires had reached southern Ontario at the Michigan border. Northerly winds on June 23, 2022 transported the smoke to Detroit, and a cold front moved through the Detroit area on June 23, 2022, bringing air and wildfire emissions from Canada behind it. The air behind the cold front subsided, which allowed the air containing wildfire emissions aloft to sink to the surface. The presence of smoke from the Canadian wildfire behind this cold front resulted in atypical air quality for such a frontal passage. Although meteorological conditions were stagnant on June 24-25, 2022, under a surface high pressure, the Canadian wildfire emissions had already been transported to the area prior and contributed to elevated ozone concentrations.

*Id.* at 32586. This explanation indicates that the EPA did not ignore the fact that BrC peaked on June 23 and provided a satisfactory rationale for its determination that the BrC data supported a finding that Canadian wildfires affected ozone levels in the Detroit area.

Next, Sierra Club contends that there was insufficient evidence connecting the wildfire smoke to the exceedances because Michigan omitted several days of data from an analysis it provided in its demonstration. Michigan provided a matching-day analysis, which compared ozone concentrations on previous days that had meteorological conditions similar to those present on June 24 and 25 with the actual ozone concentrations on June 24 and 25. If a matching-day analysis reveals high ozone concentrations on days with meteorological conditions that are not typically associated with elevated ozone, that discrepancy can constitute evidence that a source such as wildfire smoke influenced the ozone levels.

Sierra Club notes that Michigan's matching-day analysis omitted several days that had meteorological conditions similar to those on June 24 and 25 on the basis that ozone levels on those days may have also been influenced by smoke. Sierra Club argues that the evidence in the administrative record did not permit the EPA to conclude that wildfire smoke affected ozone levels on June 24 and 25 because Michigan did not provide any evidence that smoke affected ozone levels on the days it omitted from the analysis and merely stated what methods it used to analyze smoke influence. But Michigan's failure to provide more fulsome evidence that smoke affected ozone levels on the omitted days did not require the EPA to deny the exceptional-event approval. The evidence Michigan provided was extensive, consisting of a comparison of the June 24 and 25 exceedances with historical concentrations, figures showing the progression of smoke plumes over North America using satellite imagery, calculations of trajectories originating from the largest fire sites, BrC and $PM_{10}$ concentration data, ozone and $PM_{2.5}$ concentration data, information on local meteorological conditions, and a matching-day analysis. Accordingly, the matching-day analysis, combined with all the other evidence Michigan provided in its demonstration, allowed the EPA to determine that wildfire smoke affected ozone levels at the relevant monitor on June 24 and 25.

Finally, Sierra Club argues that the EPA's decision to grant the exceptional-event approval was unlawful because it did not consider how local conditions may have contributed to high ozone levels on June 24 and 25. It notes that significant sources of ozone precursor pollutants recently began operating near the relevant mile marker and contends that the EPA failed to differentiate the impacts of these sources from those of the wildfire smoke. But when

assessing Michigan's demonstration, the EPA specifically determined that the matching-day analysis demonstrated that "the meteorological conditions on the exceedance days examined in conjunction with local and background emissions do not present the conditions conducive to producing elevated ozone concentrations[;] . . . the exceedances at issue were due to wildfire smoke, rather than local pollution." Clean Data Determination for the Detroit Area for the 2015 Ozone Standard, 88 Fed. Reg. at 32586. Thus, the EPA met the requirement to demonstrate that it "reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423.

For these reasons, the EPA's decision to grant the exceptional-event approval was not arbitrary or capricious.

**B.**

Sierra Club next argues that, by issuing a Redesignation Rule redesignating the Detroit area to attainment, the EPA contravened 42 U.S.C. § 7407(d)(3)(E), which states:

(E) The Administrator may not promulgate a redesignation of a nonattainment area (or portion thereof) to attainment unless—

(i) the Administrator determines that the area has attained the national ambient air quality standard;

(ii) the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of this title;

(iii) the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;

(iv) the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 7505a of this title; and

(v) the State containing such area has met all requirements applicable to the area under section 7410 of this title and part D.

Sierra Club disputes only requirements (i), (iii), and (v). We address each challenge in turn.

**1.**

The first criterion for redesignation requires the EPA to find that "the area has attained the national ambient air quality standard." 42 U.S.C. § 7407(d)(3)(E)(i). The EPA determined that the Detroit area attained the 2015 NAAQS from 2019 through 2022. Sierra Club contends that the EPA lacked a rational basis to conclude that the Detroit area was meeting the NAAQS in light of 2022 data. It asserts that because monitoring data showed enough exceedances of the NAAQS to disqualify the area for attainment in 2022, the area could only qualify for attainment for the period from 2019 to 2022 because of the exceptional-event approval. Therefore, it argues, if this court determines that the exceptional-event approval was wrongly granted, it must also find that the EPA had no rational basis for finding that the area had attained the NAAQS during this period.

Because we conclude that the decision to grant the exceptional-event approval was not arbitrary or capricious, this argument fails.

**2.**

Sierra Club also challenges the EPA's determination that the air-quality improvement during the period from 2019 to 2022 was "due to permanent and enforceable reductions in emissions," as required by 42 U.S.C. § 7407(d)(3)(E)(iii). It asserts that the EPA lacked a rational basis for this conclusion because, given the lockdowns and economic downturn resulting from the COVID-19 pandemic during this period, the EPA could not reasonably attribute air-quality improvements to permanent emission reductions.

The record demonstrates that the EPA did, in fact, consider the pandemic's impact on emissions. The EPA examined analyses Michigan performed to determine whether air-quality improvement during the pandemic was due to pandemic-related economic conditions. Redesignation of the Detroit, MI Area to Attainment of the 2015 Ozone Standards, 87 Fed. Reg. at 14217. One such analysis showed an overall downward trend in point-source (facilities that report their emissions directly to the state, plus some additional sources) emissions in the Detroit area from 2012 to 2020, which indicated that the downward trend in emissions was not entirely attributable to the pandemic. *Id.* Another analysis showed that although the pandemic's impact

was apparent in data showing decreases in source emissions, miles of vehicle travel, and employment between 2019 and 2020, these decreases were not associated with a corresponding decline in ozone pollution—rather, ozone concentration increased from 2019 to 2020. *Id.* The EPA concluded that "these analyses show that economic conditions associated with the COVID-19 pandemic were not correlated with the improved air quality and strengthen Michigan's demonstration that the improved air quality is due to permanent and enforceable emissions reductions." *Id.* The EPA also pointed to several permanent and enforceable emission controls that had successfully reduced emissions in the Detroit area, including regional oxides-of-nitrogen controls, federal emission control measures, Detroit point-source oxides-of-nitrogen reductions, and a Michigan program requiring the sale of gasoline with a low rate of evaporation in the summer. *Id.* at 14214–16.

For these reasons, the EPA's determination that the air-quality improvements in the Detroit area were due to permanent and enforceable emission reductions was not arbitrary or capricious.

**3.**

Sierra Club next argues that the EPA lacked the authority to redesignate the Detroit area to attainment because Michigan did not satisfy the RACT requirements imposed when the area was designated Moderate nonattainment. 42 U.S.C. § 7407(d)(3)(E)(v) states, "[t]he Administrator may not promulgate a redesignation of a nonattainment area (or portion thereof) to attainment unless" the state "has met all requirements applicable to the area under section 7410 of this title and part D [of this subchapter]." The EPA's proposal to designate the Detroit area as Moderate nonattainment, issued on April 13, 2022, required Michigan to submit SIP RACT revisions and implement RACT requirements for the Detroit area by January 1, 2023. Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Marginal for the 2015 Ozone National Ambient Air Quality Standards, 87 Fed. Reg. at 21855. Michigan applied to redesignate the Detroit area as an attainment area in January 2022, before the deadline for RACT implementation. After Michigan submitted its application, the EPA issued a final rule, dated February 1, 2023, which designated the Detroit area as Moderate nonattainment and moved the deadline for RACT implementation

to March 1, 2023.  Finding of Failure to Attain and Reclassification of the Detroit Area as Moderate for the 2015 Ozone National Ambient Air Quality Standards, 88 Fed. Reg. at 6633.  In May 2023, the EPA then issued a final rule redesignating the Detroit area to attainment, despite Michigan's failure to implement RACTs for the Detroit area.  Air Plan Approval; Michigan; Redesignation of the Detroit, MI Area to Attainment of the 2015 Ozone Standards, 88 Fed. Reg. at 32594.

Sierra Club argues that, because Michigan did not satisfy the RACT requirements imposed when the area was designated Moderate nonattainment, the Detroit area had not met "all requirements applicable to the area," § 7407(d)(3)(E)(v), and thus could not satisfy the prerequisites for redesignated to attainment.  The EPA has taken the position, in its regulations and this proceeding, that § 7407(d)(3)(E)(v) excludes requirements that "came due after the submittal of a complete redesignation request," Clean Data Determination for the Detroit Area for the 2015 Ozone Standard, 88 Fed. Reg. at 32611, as was the case here, where the RACT requirements came due while the redesignation request was pending.  The EPA argues that it is sufficient that the Detroit area was in compliance with the requirements applicable to the area at the time of its application.

This argument presents a question of statutory interpretation.  "For questions of statutory interpretation, we look to the statutory language as 'the starting point for interpretation, and [] the ending point if the plain meaning of that language is clear.'"  *Davenport v. Lockwood, Andrews & Newnam, Inc.*, 854 F.3d 905, 909 (6th Cir. 2017) (quoting *United States v. Henry*, 819 F.3d 856, 870 (6th Cir. 2016)).  "The 'words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"  *Greenbaum v. EPA¸* 370 F.3d 527, 537 (6th Cir. 2004) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).  And this court must "'reject administrative constructions [] that are inconsistent with the statutory mandate.'"  *Wall v. EPA*, 265 F.3d 426, 435 (6th Cir. 2001) (quoting *Sec. Indus. Ass'n v. Bd. of Governors of the Fed. Rsrv. Sys.*, 468 U.S. 137, 143 (1984)).

In *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the Supreme Court overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) and provided the following rule regarding agency interpretations of statutes:

> Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires. Careful attention to the judgment of the Executive Branch may help inform that inquiry. And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it. But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.

*Loper Bright*, 603 U.S. at 412–13. We therefore must conduct our statutory analysis with the "presumption [] that Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch." *Id.* at 403.

We begin with statutory text. The EPA "may not promulgate a redesignation of a nonattainment area [] to attainment unless [] the State containing such area *has met* all requirements applicable to the area under section 7410 of [Title I of the Act] and part D." 42 U.S.C. § 7407(d)(3)(E)(v) (emphasis added). Since section 7407(d)(3)(E) commands the EPA not to promulgate a redesignation *unless* the state "has met" (in the present-perfect tense) certain statutory requirements, it follows that the statutory requirements must be met *at the time of* redesignation. If the state was required to meet the statutory requirements only at the time it submitted its redesignation request, the provision would operate more like an application requirement. That construction might make sense if 42 U.S.C. § 7407(d)(3)(E)(v) employed past perfect tense—prohibiting redesignation unless the state *had* met all applicable requirements (at the time of the application). But "Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992). Congress elected to use the present perfect "has met," which "denotes past action with an abiding effect or continuing relevance" and not "noncontinuing compliance." *Commonwealth of Ky. v. EPA,* 165 F.3d 26, *3 (6th Cir. Sept. 2, 1998) (unpublished table decision). And when considering 42 U.S.C. § 7407(d)(3)(E)(i), this court found that "the phrase 'has attained' [] requires that the attainment must continue until the date of redesignation." *Id.* (internal quotation marks and citation omitted). Accordingly, the

phrase "has met" in § 7407(d)(3)(E)(v) requires that all applicable requirements must be met until the date of redesignation.

The Supreme Court's recent analysis of Congress's use of the present-perfect tense in the First Step Act is also instructive. In *Hewitt v. United States*, 606 U.S. 419, 427 (2025), the Court analyzed the operative statutory text of § 403(b) of the act, which "require[es] the evaluation of whether 'a sentence . . . *has* . . . been imposed' upon the defendant." The Court reasoned that the use of "the present-perfect tense conveys to a listener that the event in question continues to be true or valid" and therefore concluded that Congress's use of the present-perfect tense indicated "that § 403(b) covers only past sentences with continued legal validity[.]" *Id.* at 429. Congress's use of the present-perfect tense in 42 U.S.C. § 7407(d)(3)(E)(v) similarly conveys that the event in question—here, the Detroit area's implementation of the applicable RACT requirements—must continue to be true until the date of redesignation.

The EPA notes that the present-perfect tense can both be used to denote events that began in the past and continue to the present, or "events that occurred in the past that have significance in the present day." Respondent's Br. at 54 (citing *Present Perfect,* Collins Cobuild English Dictionary (2024); and *Present Perfect,* Cambridge Dictionary (2024)). The EPA therefore argues that the use of the present perfect does not definitively resolve this issue because its construction—that the state need meet only the requirements applicable at the time of application—is consistent with one use of the present-perfect tense, while Sierra Club's construction—that the state's obligation to meet applicable standards is ongoing—is consistent with the other use of the present-perfect tense. But the EPA does not explain how its construction gives full effect to the statute's use of the present perfect. If the use of the present perfect "has met" refers to past events with significance for the present, what significance is accorded to the past compliance with the statute under its interpretation? Moreover, under the EPA's construction, the statute's meaning would be unchanged with the elimination of the word "has." We disfavor statutory interpretations that render a word or phrase superfluous. *See Kungys v. United States*, 485 U.S. 759, 778 (1988) (plurality opinion of Scalia, J.) (citing the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant").

"Context confirms this reading." *Southwest Airlines Co. v. Saxon,* 596 U.S. 450, 457 (2022). The statute clearly contemplates escalating requirements even when a state has submitted a request to redesignate an area to attainment. The nonattainment scheme in the CAA adjusts an area's obligations based on its failure to comply with the statute's deadline for achieving attainment. It is the state's failure to meet the deadline, not a finding that the state's air quality has worsened, that triggers a bump-up in the CAA requirements. When a state fails to meet its deadline, it is bumped up, and the stricter requirements go into effect. Those requirements remain in effect as a redesignation request is pending. *Commonwealth,* 165 F.3d at *3. Indeed, the statutory provision allowing redesignation requests expressly states that a state's submission of a redesignation request "shall not affect the effectiveness or enforceability of the applicable implementation plan for the State." 42 U.S.C. § 7407(d)(3)(D).

Here, the EPA ordered Michigan to submit a revised SIP implementing RACT by March 1, 2023. Had Michigan done so, that revised SIP would have been "the applicable implementation plan." *See* 42 U.S.C. § 7407(d)(3)(D). A state cannot avoid the requirements of an amended SIP by simply failing to submit the amendment. That the statute both requires a state to adjust its implementation based on a deadline and prohibits a state from relying on its submission of a redesignation request to forestall compliance with the applicable SIP offers strong support for the Sierra Club's construction of § 7407(d)(3)(E)(v). Finally, the statute contains no exception to the RACT requirements for states that had met the NAAQS at the effective date of the new designation. The regulatory exception, which allows the EPA to make a clean-data determination when the NAAQS are attained, suspends implementation of some federal requirements but does not provide for the suspension of RACT implementation. *See* 40 C.F.R. § 51.1318. Excusing non-compliance with the statute's deadlines would render toothless the requirement that a state continue complying with the CAA even if it already submitted a redesignation request and would allow states to simply request redesignation and ignore any changes required after the date of the request.

The timeline of events in this case demonstrates the problem with the EPA's preferred construction. By the time of its redesignation on May 19, 2023, Michigan had failed to meet its August 3, 2021 deadline to bring the Detroit area into attainment. That failure to meet the

attainment deadline triggered the bump up from Marginal to Moderate on March 1, 2023. From the time of the EPA's initial determination that the Detroit area was not in attainment on April 13, 2022, Michigan knew that it had an impending deadline to submit and implement ozone RACT requirements, first set at January 1, 2023, and later moved to March 1, 2023.[1] That a redesignation request was pending at the time of the bump up did not preserve the area's nonattainment classification at the Marginal level or suspend implementation of the RACT requirements. *See* Air Plan Approval; Michigan; Redesignation of the Detroit, MI Area to Attainment of the 2015 Ozone Standards, 88 Fed. Reg. at 32594, 32598.

The EPA makes an additional textual argument that 42 U.S.C. § 7407(d)(3)(E)(v) is directed at states, whereas the requirements in § 7407(d)(3)(E)(i)-(iv) are directed at the EPA itself. Because § 7407(d)(3)(E)(v) is directed at the states, and the state's role in the redesignation process concludes when it submits a redesignation request, the EPA argues § 7407(d)(3)(E)(v) only covers requirements in place prior to the submission of an application.

This argument fails for four reasons. First, the statute explicitly prohibits states from relying on a redesignation request to excuse future compliance with the applicable SIP. *See id.* § 7407(d)(3)(D). The state therefore has continuing compliance obligations, even after submitting a redesignation request. Second, the "[r]esponsibility for meeting the NAAQS rests with the states." *Wall,* 265 F.3d at 428. Therefore, the fact that § 7407(d)(3)(E)(v) notes the states' responsibility to meet the requirements is consistent with the CAA's imposition of compliance responsibility and does not suggest any timing-based exemption based on application submittal. Third, although § 7407(d)(3)(E)(v) does indeed begin with different language than subsections (i)-(iv), all five subsections serve as requirements for "the Administrator" to promulgate a redesignation. All five subsections, including subsection (v), thus constrain the EPA's actions. We discern the ordinary meaning of contested statutory text by reading those words "in their context, not in isolation." *Southwest Airlines,* 596 U.S. at 455 (citation

---

[1]The RACT requirements are always imposed when an area is designated Moderate nonattainment or higher. 42 U.S.C. § 7511a(b)(2); 40 C.F.R. § 51.1312(a)(1); *Wall,* 265 F.3d at 429 ("For a moderate ozone nonattainment area, a SIP must include the following specific measures: (1) pollution limits that reflect the 'reasonably available control technology' (RACT) for existing factories that emit VOCs, and (2) procedures to ensure that state and local transportation plans and projects conform to the clean air plans." (internal citations omitted)).

modified). Here, the statute provides redesignation requirements *imposed upon the agency*, not the states. *See* 42 U.S.C. § 7407(d)(3)(E) ("The *Administrator* may not . . ." (emphasis added)). Fourth, the EPA's interpretation finds no support in this court's precedent, which has described § 7407(d)(3)(E)(v) consistently with the other provisions as a burden imposed on the EPA. *See, e.g.*, *Greenbaum*, 370 F.3d at 531 ("The EPA may not redesignate an area to attainment unless: . . . (v) *the EPA has determined* that the State containing the area seeking redesignation has met all applicable SIP requirements for that area under § 110 with respect to SIPs generally, and under Part D with respect to SIP provisions for nonattainment areas." (citing 42 U.S.C. § 7407(d)(3)(E)) (emphasis added)). We therefore reject the EPA's contention that, because § 7407(d)(3)(E)(v) is framed as a state's compliance obligation, it imposes no continuing compliance obligations beyond the date of the redesignation request.

Finally, the EPA contends that an interpretation of the "applicable" requirements as those requirements applicable at the time of redesignation would delay action on the redesignation request beyond the 18-month time frame permitted for EPA to approve or deny the request, since an intervening bump-up would require the state to make additional SIP submissions. But the Sierra Club's construction is not unworkable. The EPA can decline the redesignation request pending before it within the 18-month time frame and require the state to resubmit a new redesignation request based on attainment of the NAAQS and compliance with the requirements applicable to the area. And, the EPA has some leeway in setting RACT compliance dates. The EPA recognized that it could have extended the deadline for the RACT SIP for up to two years after the final date of its determination. Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Marginal for the 2015 Ozone National Ambient Air Quality Standards, 87 Fed. Reg. at 21855. But it chose not to do so because of a desire for consistency and to make the requirements effective at the beginning of the compliance year. *Id.* at 21855–56; Finding of Failure to Attain and Reclassification of the Detroit Area as Moderate for the 2015 Ozone National Ambient Air Quality Standards, 88 Fed. Reg. at 6634. If the EPA grants a redesignation before the stricter requirements come due, the problem is avoided entirely. The EPA cannot, however, require RACT implementation by a certain date, and then ignore a state's failure to comply in assessing a redesignation request. Thus, Sierra Club's proposed interpretation would not render the statutory scheme unworkable.

For these reasons, we conclude that 7407(d)(3)(E)(v) permits redesignation only when a state "has met all requirements applicable to the area" at the time of redesignation, rather than at the time a state submits its application for redesignation.

**V.**

For the reasons set out above, we AFFIRM in part and VACATE in part.